UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
RON HAREWOOD,                      )
                                   )
            Plaintiff,             )
                                   )    CIVIL ACTION
      v.                           )    NO. 12-12144-TSH
                                   )
GENZYME CORPORATION,               )
                                   )
            Defendant.             )
_____)


**MEMORANDUM OF DECISION ON DEFENDANT GENZYME CORPORATION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 28)**
**June 13, 2014**

HILLMAN, D.J.

## Introduction

Plaintiff Ron Harewood ("Plaintiff") brings three claims against Defendant Genzyme Corporation ("Defendant" or "Genzyme") for race and color discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. s. 2000e-2 (Count I) and Massachusetts General Laws Chapter 151B (Count II). Plaintiff claims that Defendant (1) refused to promote him because of his race and/or color; (2) did not select him for other positions for which had had applied for within Genzyme because of his race and/or color; and (3) terminated his employment because of his race and/or color. Defendant now moves for summary judgment on Plaintiff's second (failure to transfer) and third (termination) claims. For the reasons set forth below, that motion is granted.

## Facts

Genzyme is a biotechnology company that focuses on the development of treatments for serious and debilitating diseases, such as multiple sclerosis. On August 12, 2008, Plaintiff began

working for Genzyme as a Document Specialist. As part of this position, he was responsible for "obsoleting" documents, or ensuring that outdated policies or procedures were removed from circulation within the Company.

In 2010, all Genzyme employees, including Plaintiff, were eligible to take seven days of sick leave per calendar year. In addition, employees in Plaintiff's group were eligible to use up to five vacation days per calendar year for unscheduled absences. By the middle of May 2010, Plaintiff had already used up his allotment of twelve days for unscheduled absences. Sarah McGrath ("McGrath"), Genzyme's Manager of Quality Documentation and Plaintiff's manager at the time, met with Plaintiff on May 18, 2010 to discuss this issue. McGrath emphasized the need for Plaintiff to improve his attendance. McGrath met with Plaintiff again on August 20, 2010 and September 13, 2010 to discuss her concerns about his attendance. By October, Plaintiff had 18 unscheduled absences. McGrath issued Plaintiff a written warning on October 5, 2010 that stated that if Plaintiff failed to improve his attendance, he would "be subject to further disciplinary action, up to and including the termination of [his] employment with Genzyme."

McGrath completed a performance evaluation for Plaintiff for 2010. She gave him a "Fails to Meet" rating in the category of "Attendance & Punctuality." In her comments, she noted that Plaintiff's absences affected other members of his team because "any work not performed by him due to time away had to be completed by the remaining team members." McGrath also gave Plaintiff a rating of "Partially Meets Expectations" in the following four categories: Job Knowledge and Results, Planning and Organization, Problem Solving and Decision Making, and Safety, Health & Security. She also stated that he "did not demonstrate an understanding of the urgency of tasks within his role," failed to complete tasks in a timely manner, and that his "performance in 2010 was not at the level expected of an employee who has been with Genzyme

2

for over 2 years." McGrath gave Plaintiff an overall performance rating of "partially meets expectations," the second lowest possible rating for 2010.[1]

Throughout the course of his employment, Plaintiff applied for eleven different positions within Genzyme. Genzyme claims it did not fill nine of those positions, and selected other candidates for the remaining two. Plaintiff asserts multiple individuals were given promotions he applied for.

In January 2011, Marilee Fields ("Fields") replaced McGrath as Plaintiff's manager. Shortly after becoming his manager, Fields spoke with Plaintiff about the concerns previously raised by McGrath and told him she was willing to work with him to improve his performance. Fields wrote "I feel confident that I can help him reach his goals" on Plaintiff's performance evaluation. Fields did not recommend issuing Plaintiff a Corrective Action Plan at that time. Instead, Fields indicated that she would "revisit his progress in the next 60 days." Plaintiff performed well under Fields' leadership and in August 2011 Fields gave him a positive mid-year evaluation.

In the fall of 2011, Genzyme claims Field received complaints from customers that Plaintiff failed to complete his assignments in a timely fashion. Plaintiff notes that he never personally received or saw such a complaint, but acknowledges that Fields told him she received complaints. Fields met with Plaintiff on October 7, 2011, November 4, 2011 and December 20, 2011 to discuss these issues, as well as her concerns about his punctuality and the fact that he appeared to be taking an excessive number of breaks during the day. Plaintiff admits these meetings took place, but seems to deny they were related to attendance or tardiness.

---

[1] Plaintiff admits that the above is an accurate description of his 2010 performance evaluation, but denies the underlying truth of the matters asserted therein.

In January 2012, Zachary Ozker ("Ozker") replaced Fields as Plaintiff's manager. Plaintiff notes that to the best of his knowledge, Fields remained his supervisor until his termination, though he points to no evidence of this. Indeed, Plaintiff has stated that he started reporting to Ozker in January 2012.

A Corrective Action Plan (the "CAP") was delivered to Plaintiff by email on January 9, 2012. Amanda Webb, a member of Genzyme's human resources department, and Tina Self, Genzyme's Senior Quality Director, met with Plaintiff on January 26, 2012 to discuss the plan. The CAP stated that Plaintiff "demonstrated an inability to maintain consistent and dependable attendance," noting specifically that Plaintiff was late seven times in the last two weeks of December 2011. The CAP also stated that Plaintiff's supervisors "continued to receive customer complaints that their work has not been completed and is sitting with [him] waiting for over 4 months."[2] To address these issues, the CAP contained a number of goals that Plaintiff was to complete in the next thirty days, including being at work from 8:30 am to 5:00 pm each work day, following guidelines for lunch and break times, and emptying his workflow inbox by the end of business on Friday February 3rd, 2012. The CAP also required Plaintiff, among other things, to complete certain obsoletes within one day of receipt. The CAP stated that if Plaintiff failed to meet the listed goals in thirty days, his employment would be terminated.

After this meeting, Plaintiff submitted a memorandum stating that he had "come in late or missed days" and also stating that he had been "discriminating against and targeted" by Fields. Webb subsequently informed Plaintiff that she had investigated his claims and found them to be unsubstantiated. Plaintiff admits that Webb told him this, but does not believe an adequate investigation took place.

---

[2] Again, Plaintiff admits these statements are contained in the document, but denies their underlying truth.

After receiving the CAP, Plaintiff met with Ozker each week to assess his performance against the CAP goals. Ozker has testified that in the 22 business days between January 26, 2012 and February 27, 2012, Plaintiff was absent from work on five days, late on 17 of the 18 days that he reported to work and that he worked fewer than eight hours on 15 of those days. Plaintiff denies this, though points to no evidence refuting it. In addition, although Ozker told Plaintiff to make it his "highest priority" to reinstate a particular document, Plaintiff failed to do so and instead reassigned that task to another employee without consulting Ozker. Plaintiff also failed to complete certain obsoleting requests within a day of receipt, as required by the CAP. Ozker decided to terminate Plaintiff's employment in light of his failure to satisfy the CAP goals. Plaintiff contends, without any supporting evidence, that Fields influenced the decision to terminate his employment. Ozker has testified, however, that he did not request Fields' input regarding this decision. Plaintiff's last day of employment was March 2, 2012.

## Discussion

*Standard of Review*

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and thus "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1968). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's

case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 4). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic*, Inc., 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).

*Employment Discrimination Framework*

A party may prove an employment discrimination case through either direct or circumstantial evidence. When a plaintiff presents direct evidence of discrimination, the burden of persuasion shifts to the employer to "prove that it would have made the same decision even if it had not taken the protected characteristic into account." *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 421 (1st Cir. 1996). When there is no direct evidence of discrimination, the plaintiff must prove his case under the standard set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802-803, 93 S. Ct. 1817 (1973); *Knight v. Avon Products, Inc*., 438 Mass. 413, 420-22 (2003). Under this framework, the plaintiff must first establish a prima facie case of discrimination by showing, in a failure to transfer case: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications," or, in a wrongful termination case, that "(1)[]he was within a protected class, (2) possessed the necessary qualifications and adequately performed her job, (3) but was nevertheless dismissed and (4) [his] employer sought someone of roughly equivalent qualifications to perform substantially the same work." *McDonnell Douglas Corp.*, 411 U.S. at

802; *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005). If a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection or termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer does so, the plaintiff then must show the proffered reasons was not the true reason for the employment decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-508, 113 S. Ct. 2742 (1993) (internal quotations omitted). The burden of proving unlawful discrimination at all times rests with the plaintiff. *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 470 (1st Cir. 2010)

Here, Plaintiff has proffered one piece of evidence which could be considered "direct" evidence, his allegation that Fields told him he would never be promoted because he was black. While this can certainly be considered direct evidence for his claim that he was not promoted due to his race, it is not direct evidence that he was not transferred or that he was terminated because of his race, as there is no evidence that Fields was involved in either of those decisions. To the contrary, the evidence, including Plaintiff's own testimony, shows that Ozker became Plaintiff's supervisor in January 2012. The record reflects, and Plaintiff has pointed to no evidence to refute, that Ozker made the decision to terminate Plaintiff with no input from Fields. Similarly, there is no evidence that Fields was involved in any way in the hiring decisions for the positions Plaintiff applied to transfer into, but were ultimately filled by other applicants.

As such, for the termination and failure to transfer claims, which are the only claims at issue in Genzyme's Partial Motion for Summary Judgment, the *McDonnell Douglas* framework applies. There is no argument as to the first requirement establishing a prima facie case; that Plaintiff, an African-American, is in a protected class.

*Termination*

Genzyme argues that it should be granted summary judgment on Plaintiff's claim that he was terminated because of his race/color because it was articulated a legitimate, nondiscriminatory reason for the termination, and Plaintiff cannot show this reason is mere pretext. The record supports Genzyme's position that it has legitimate, nondiscriminatory reasons for termination. There is both documentary and testimonial evidence of issues with Plaintiff's attendance and failure to complete assignments in a timely matter dating back to at least his 2010 performance review. As a result of these issues, Plaintiff was eventually issued the CAP, which explicitly stated that Plaintiff would be terminated if he failed to meet certain enumerated goals. When Ozker determined Plaintiff had not met these goals, he was terminated.

Plaintiff responds that a juror could conclude the proffered reasons was false because of the alleged statement made by Fields and because there is no actual documentation of tardiness, absenteeism, customer complaints, or the reason for his termination. The latter argument can be easily dispatched with; first, there is documentary evidence, such as the CAP, showing the attendance issues. Second, there is no rule requiring a particular type of evidence to prove a given fact. Here, in addition to the CAP, a written warning, and Plaintiff's performance reviews, there is testimonial evidence on the record regarding the issues with Plaintiff's performance which Plaintiff has no evidence to refute.

Plaintiff's argument regarding Fields also fails. As discussed above, Plaintiff has pointed to no evidence that Fields was involved in the decision to terminate his employment, merely making that allegation as part of his opposition to Defendant's motion for summary judgment. *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) ("a party cannot successfully oppose a motion for summary judgment by resting upon mere allegations or denials of his pleading.").

As such, it is Ozker motivations, not Fields, which are the subject of inquiry regarding Plaintiff's termination. *Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 126 (1st Cir. 2011) ("When assessing a claim of pretext in an employment discrimination case, the court must focus on the motivations and perceptions of the employer's decisionmaker."); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 41 (1st Cir. 2001). ("In assessing pretext, our focus must be on the perception of the decisionmaker") (internal quotations omitted). Such remarks made by non-decision makers such as Fields are simply "not significantly probative of pretext." *Bonefont-Igaravidez*, 659 F.3d at 125; *Straughn*, 250 F.3d at 36 (noting that the probitiveness of "stray" discriminatory remarks is circumscribed if they "were not related to the employment decision in question, *or* were made by nondecisionmakers.") (internal quotations omitted) (emphasis in original); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."). Plaintiff has put forth no evidence of any discriminatory motivation by Ozker, the one who made the decision to terminate Plaintiff, nor any other evidence suggesting pretext beyond the one alleged comment by Fields. This is not enough to defeat summary judgment on the termination claims.

*Failure to Transfer*

Plaintiff applied for eleven positions within Genzyme during his employment. Nine of those were positions were never filled. As to those nine positions, Plaintiff fails to make out a prima facie case because he cannot show he suffered any adverse employment action. *Lockridge*, 597 F.3d at 470 (stating that to establish a prima facie case for discrimination, the "plaintiff must show, among other things, that she suffered an adverse employment action."). As to the remaining positions, Quality Control Analyst and Senior HSE Staff Assistant, both of

which were outside Plaintiff's department, Plaintiff has put forth no evidence to show he was qualified for these positions, was rejected despite these qualifications, or that the individuals ultimately hired had similar qualifications. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7, 12 (1st Cir. 2011) (requiring plaintiff to show "she was qualified for the position" but "rejected in favor of a similarly qualified individual" to establish a prima facie case for the failure to hire). Plaintiff did not dispute this in his opposition to Defendant's motion for summary judgment, or at oral argument. As such, summary judgment is granted in favor of Defendant on the failure to transfer claims.

## **Conclusion**

For the reasons stated above, Defendant's Motion for Partial Summary Judgment (Docket No. 28) is ***granted***.

SO ORDERED.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**